UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

BENNIE LEN BULLOCK,

Plaintiff,

v.                                                    CAUSE NO. 3:24cv374 DRL

BIMBO BAKERIES GROUP USA,

Defendant.

OPINION AND ORDER

Bennie Len Bullock suffers from chronic back pain and lumbar spinal stenosis. Shortly after becoming employed at Bimbo Bakeries USA, Inc., he requested an accommodation to work 8-hour shifts instead of the regular 12-hour shifts because of his condition. Bimbo engaged in an interactive process but terminated him after determining this wasn't a reasonable request. Mr. Bullock filed suit under the Americans with Disabilities Act (ADA). Bimbo requests summary judgment on his claims. The court grants the motion.

BACKGROUND

The summary judgment record establishes the following facts, as viewed in the light most favorable to Mr. Bullock.[1] *See Lauth v. Covance, Inc.*, 863 F.3d 708, 710 (7th Cir. 2017). Bimbo is a commercial baking company that bakes and sells goods across the country and operates a bakery

---

[1] Mr. Bullock's response violated both Local Rule 56-1 and this presider's summary judgment practice procedures. His brief didn't accompany a statement of undisputed material facts. Nor did he cite (much less verbatim respond) to Bimbo's statement of material facts. As stated in a prior order, the court treats Bimbo's statement of undisputed facts as undisputed today in lieu of striking Mr. Bullock's submission. Fed. R. Civ. P. 56(e)(2); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).

in Elkhart, Indiana that runs 24 hours per day [65-11 ¶ 2-3]. Bimbo schedules employees on two shifts of 12 hours each and staffs, plans, and schedules based on this shift structure [*id.* ¶ 4-5].

Bimbo hired Mr. Bullock on September 6, 2022 as a production technician [*id.* ¶ 10]. During the interview process, Bimbo told him that he would be working 12-hour shifts; he agreed that he could do that, and he understood that he would be working the night shift [65-1 Tr. 23-24, 27]. During his first two weeks of training, Bimbo allowed him to work either 8 or 12-hour shifts to help him adjust [65-11 ¶ 6; 65-1 Tr. 30, 32]. Mr. Bullock nonetheless testified he understood he would work 12-hour shifts after orientation ended [65-1 Tr. 30].

The month Bimbo hired him, Mr. Bullock requested an accommodation to work 8-hour shifts because of his back condition [*id.* Tr. 36-37; 65-3; 65-11 ¶ 11]. On September 19, 2022, he emailed human resources a September 15, 2022 letter from his longtime doctor stating he had chronic back pain and lumbar spinal stenosis, and that he should be limited to 8-hour shifts [65-1 Tr. 39-40; 69-5]. Mr. Bullock testified that he didn't request the restriction; instead, at a recent appointment, his doctor "[o]ut of the clear blue" said he didn't want Mr. Bullock working 12-hour shifts [65-11 Tr. 36]. Mr. Bullock also testified that lumbar spinal stenosis is another name for a pinched nerve [*id.* Tr. 39]. His email asked Bimbo to "[p]lease let [him] know if this can be done. If not, [he] really thank[s] [Bimbo] for hiring [him]" [65-3 at 2]. He testified that his back condition required him to avoid overexertion, including lifting more than 100 pounds and to follow proper procedures for lifting 50 pounds [65-1 Tr. 87-88].

Mr. Bullock met with Morgan Verhaeghe, a Bimbo human resources employee, on September 22, 2022 to begin the interactive process [*see* 65-5]. Ms. Verhaeghe gave him an accommodation request form and a confidential interactive dialogue questionnaire, which included a physician form [*id.*]. In the questionnaire, Mr. Bullock wrote that a pinched nerve in

2

his back made it difficult to stand for 12 hours, that he wasn't sure if the condition was temporary, and that a shorter shift would help accommodate him [65-4]. He later testified that he hoped the condition, caused by a car accident four years prior, wasn't permanent [65-11 Tr. 50-51, 56-57]. Mr. Bullock's physician certified that Mr. Bullock's condition didn't substantially limit a major life activity and recommended only that work that included bending, lifting, and standing be limited to 8-hour shifts indefinitely [65-6 at 4-5]. The form also stated that his condition was expected to worsen over time [*id.* 5].

In an email exchange, Sheila Houser, Bimbo's human resources manager, explained to Mr. Bullock that, though Bimbo tries to accommodate short-term requests for adjusted shifts, from his doctor's note his request was instead long-term and would leave the company with no one to cover the remaining four hours of a shift [65-7 at 3]. Ms. Houser's email said she understood Mr. Bullock had agreed to work 12-hour shifts when he was hired, and he didn't request the accommodation during the interview process [*id.*].

She also explained that 8-hour shift length jobs were available on the shipping side of the facility, operated by Specialized Staffing, which hires its own employees, has its own onsite managers and supervisors, and operates independently from Bimbo [*id.*; 65-11 ¶ 7-8]. Mr. Bullock testified that he toured the entire facility, and it appeared Specialized Staff employees were doing the same thing as Bimbo employees and worked in the same area, though he didn't know specifically what they were doing [65-1 Tr. 64]. Ms. Houser said he could apply for a job there if interested [65-7 at 3]. Mr. Bullock responded to that email explaining that when he interviewed for the job, he hadn't seen his doctor, and it was his doctor who voluntarily wrote the letter requesting shorter shifts [*id.* at 2-3]. Mr. Bullock testified he never ended up applying for a job

with Specialized Staffing because Ms. Houser didn't provide Mr. Bullock a recommendation or tell him she would get him hired [65-1 Tr. 65].

Mr. Bullock testified he disagreed with Bimbo's statement that it didn't have any 8-hour shift positions in production because it was "one big operation," Specialized Staffing employees worked 8-hour shifts, and the union contract "calls for eight hours" [*id.* Tr. 65-66]. He couldn't name any Bimbo employees who worked shorter than 12-hour shifts [*id.* Tr. 66]. He also disagreed with Bimbo's statement that his accommodation would leave the company with no one to cover the remaining four hours of the shift because during his orientation period he heard talk of floaters who filled in for other employees and because Bimbo "ha[s] a contingency plan" [*id.* Tr. 67], though Mr. Bullock didn't know how Bimbo would fill the four hours if a floater worked a 12-hour shift like all other employees [*id.* Tr. 68-69].

On November 17, 2022, Mr. Bullock met with a Bimbo supervisor and human resources representative to continue the interactive process; human resources memorialized the meeting in a form [65-1 Tr. 70-71; 65-8]. Mr. Bullock testified the form, completed by a human resources representative, "possibly" noted what he said [65-1 Tr. 72]. The form recalled Mr. Bullock reporting that his condition limits him and he cannot stand for 12 hours [65-8 at 2]. He said the only accommodation he could suggest was that recommended by his doctor—working 8-hour shifts [*id.* 3].

On November 30, 2022, Ms. Houser wrote Mr. Bullock a letter telling him that Bimbo couldn't accommodate the request, and that no reasonable accommodation existed that would permit him to perform the essential functions of his job, with or without an accommodation [65-9; 65-1 Tr. 78]. Her letter also said Bimbo wanted to discuss with him the possibility of a reasonable accommodation by transferring him to another position within the company and

4

instructed him to use an enclosed form to identify positions that interested him and for which he believed he was qualified [65-9 at 2-3]. The form included ten open positions at the Elkhart location [65-9 at 2-3].

Mr. Bullock applied for two positions: production supervisor and sanitation technician [65-1 Tr. 79-80]. He didn't know of any production supervisors or sanitation technicians who worked 8-hour shifts, and he was told he wasn't qualified for the production supervisor position [65-1 Tr. 79-81]. In an affidavit, Ms. Houser said that both positions work shifts "that are well over 8 hours" and that Mr. Bullock wasn't qualified for the production supervisor position, a leadership role requiring production supervisory experience [65-11 ¶ 16-17]. Mr. Bullock said he never applied for any other Bimbo job [65-1 Tr. 81-82].

Bimbo sent Mr. Bullock a final letter on March 21, 2023 explaining that it was terminating his employment effective April 20, 2023 because no reasonable accommodation would allow him to perform the essential functions of his job with or without an accommodation and there were no alternative positions for which he was qualified [65-10 at 2]. Bimbo invited Mr. Bullock to provide any additional information before April 20 and said the administrative termination doesn't affect his right to apply for future Bimbo jobs [*id.*]. Mr. Bullock didn't provide any additional information, and he was terminated [65-1 at 83-84].

## STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must present the court with evidence on which a reasonable jury could rely to find in her favor. *Beardsall v. CVS Pharm., Inc.*, 953 F.3d 969, 972 (7th Cir. 2020). The court must construe all facts in the light most favorable to the non-moving party, view all

reasonable inferences in that party's favor, *Bellaver v. Quanex Corp./Nichols-Homeshield*, 200 F.3d 485, 491-92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003); *see also Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 924-25 (7th Cir. 2020).

In performing its review, the court "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Nor is the court "obliged to research and construct legal arguments for parties." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011). Instead, the "court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge*, 24 F.3d at 920. The court must grant summary judgment when no such genuine factual issue—a triable issue—exists under the law. *Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 731 (7th Cir. 2011).

## DISCUSSION

The ADA seeks to eliminate "discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). "Under the ADA, there are two types of discrimination claims: failure to accommodate and disparate treatment." *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 285 n.4 (7th Cir. 2015).[2] Though it remains unclear which theory Mr. Bullock advances, the distinction isn't of significance because to prove either, he would have to establish that he was both disabled and qualified to perform the essential functions of the job with or without reasonable

---

[2] Mr. Bullock's amended complaint also stated a retaliation claim. His response to Bimbo's motion for summary judgment declines to defend this claim. Thus, the court considers this claim abandoned, and the court summarily grants summary judgment for Bimbo as to that claim. *See Palmer v. Marion Cnty.,* 327 F.3d 588, 597-98 (7th Cir. 2003) (affirming summary judgment against an abandoned claim); *Little v. Mitsubishi Motors N. Am., Inc.*, 261 F. Appx. 901, 903 (7th Cir. 2008) (same).

accommodation. *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019). Mr. Bullock has failed to establish a genuine triable issue that he was a qualified individual with a disability under the ADA.

The ADA only protects a "qualified individual with a disability." *Basith v. Cook Cnty.*, 241 F.3d 919, 927 (7th Cir. 2001). A qualified individual with a disability is one who can perform the essential functions of the employment positions that the individual holds, with or without reasonable accommodation. 42 U.S.C. § 12111(8). A physical or mental condition must substantially limit one or more major life activities to qualify as a disability under the ADA. 42 U.S.C. § 12102(1)-(2); 29 C.F.R. § 1630.2(j)(1)(ii); *see Youngman v. Peoria Cnty.*, 947 F.3d 1037, 1042 (7th Cir. 2020). Mr. Bullock bears the burden of establishing he is disabled. *Povey v. City of Jeffersonville*, 697 F.3d 619, 624 (7th Cir. 2012).

A medical condition "by itself does not constitute a disability" under the ADA. *Nese v. Julian Nordic Constr. Co.*, 405 F.3d 638, 642-43 (7th Cir. 2005). "Merely having an impairment does not make one disabled for purposes of the ADA." *Toyota Motor Mfg., Ky. v. Williams*, 534 U.S. 184, 195 (2002), *abrogated by statute on other grounds, Richardson v. Chi. Transit Auth.*, 926 F.3d 881, 888 (7th Cir. 2019). Rather than offer "general protection of medically afflicted persons," the ADA protects people from discrimination "because they are in fact disabled[.]" *Christian v. St. Anthony Med. Ctr.*, 117 F.3d 1051, 1053 (7th Cir. 1997).

The court conducts an individualized inquiry to determine whether someone is disabled. *Byrne v. Bd. of Ed., Sch. Of W. Allis-W. Milwaukee*, 979 F.2d 560, 565 (7th Cir. 1992); *see* 29 C.F.R. § 1630.2(j)(1)(iv). The ADA provides three ways to establish a disability. Mr. Bullock can show (1) "a physical or mental impairment that substantially limits one or more major life activities," (2) "a record of such an impairment," or (3) that he is "regarded as having such an impairment." 42 U.S.C. § 12102(1). Mr. Bullock seems to rely solely on the first method.

The ADA instructs courts to construe the definition of disability "in favor of broad coverage." 42 U.S.C. § 12102(4)(A). Major life activities include, but are not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, concentrating, thinking, communicating, interacting with others, and working." 29 C.F.R. § 1630.2(i)(1)(i). When determining whether a disability "substantially limits" a person from performing such an activity, the law considers "the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment…generally, short-term, temporary restrictions, with little or no long-term impact, are not substantially limiting and do not render a person disabled for purposes of the ADA." *Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540, 554 (7th Cir. 2011) (citations omitted). An impairment doesn't need to outright prevent or even severely restrict "the individual from performing a major life activity in order to be considered substantially limiting," as it is not meant to be "a demanding standard." 29 C.F.R. §§ 1630.2(j)(i)-(ii). But "not every impairment will constitute a disability," 29 C.F.R. § 1630.2(j)(ii), and not every condition that causes discomfort, even at work, will qualify as a substantial impairment, *see Oliver v. Amazon.com Servs. LLC*, 2024 U.S. App. LEXIS 9951, 9 (7th Cir. Apr. 24, 2024) (anxiety resulting in some loss of concentration at work didn't rise to the level of disability). A plaintiff can "establish a substantially limiting impairment by presenting evidence of [his] relative inability to perform a major life activity as compared to most people in the general population." *Frazier-Hill v. Chi. Transit Auth.*, 75 F.4th 797, 803 (7th Cir. 2023) (quotations omitted).

To be sure, chronic back pain and lumbar spinal stenosis qualify as physical impairments—this Bimbo does not contest. But the ADA requires more than a diagnosis; Mr.

8

Bullock must produce evidence his condition substantially limited a major life activity or bodily function. *See* 42 U.S.C. §§ 12102(1)(A), (2)(A)-(B); 29 C.F.R. § 1630.2(j)(1)(i)-(ii); *see also Powers v. USF Holland, Inc.*, 667 F.3d 815, 819 (7th Cir. 2011) ("Merely having a physical injury or medical condition is not enough.").

Though the court sympathizes with Mr. Bullock's condition, even construing all evidence in his favor, the record doesn't permit a reasonable jury to find that he is a qualified individual with a disability. To begin, Mr. Bullock doesn't identify any major life activity that his condition substantially limits; he argues only, in conclusory fashion, that he is "disabled." But that isn't enough. Mr. Bullock must point to evidence from which a reasonable jury could find that his condition substantially limited a major life activity or bodily function. *See* 42 U.S.C. §§ 12102(1)(A), (2)(A)-(B); *Frazier-Hill*, 75 F.4th at 803-06. His physician certified that his condition didn't substantially limit a major life activity or bodily function and recommended only that work involving bending, lifting, and standing be limited to 8-hour shifts. Mr. Bullock likewise communicated to Bimbo only that the condition made it difficult to stand for twelve hours, that he wasn't sure whether the condition was temporary, and that a shorter shift would help accommodate him [65-4]. Preventing someone from standing for a 12-hour stretch is one thing, but a condition that would permit that same individual to stand during an otherwise normal 8-hour workday could not be considered by a reasonable jury to be a substantial limitation on a major life activity, and thus a disability within the law's meaning, particularly as compared with most people in the general population. *See* 29 C.F.R. § 1630.2(j)(1)(ii).

The same is true of lifting and working. Mr. Bullock testified only that his back condition prevented him from lifting 100 pounds and required him to "follow procedure" to lift 50 pounds [65-1 Tr. 88]. But he had no lifting restrictions for work, identified no occasion at home requiring

that degree of lifting, and again medical documentation expressly disclaims any substantial limitation in a major life activity or bodily function [*id.* Tr. 88; 65-6 at 3]. On this record, the limitation concerns unusually heavy lifting, not lifting generally. *Compare Chi. Reg'l Council of Carpenters v. Thorne Assocs., Inc.*, 893 F. Supp.2d 952, 962 (N.D. Ill. 2012) (inability to lift 50-and 100-pound boxes does not alone establish a substantial limitation in lifting compared with the general population), *with Jankowski v. Dean Foods Co.*, 378 F. Supp.3d 697, 707 (N.D. Ill. 2019) (plaintiff's inability to lift more than 25 pounds from floor to waist could substantially limit his ability to perform the major life activity of lifting).

Though working is a major life activity too, *see* 42 U.S. C. § 12102(2)(A), the relevant inquiry is not whether Mr. Bullock had difficulty performing this job's 12-hour shift, but whether his condition substantially limited his ability to perform a class of jobs or broad range of jobs in various classes, *Povey v. City of Jeffersonville*, 697 F.3d 619, 623 (7th Cir. 2012); 42 U.S.C. § 12102(2)(A); 29 C.F.R. pt. 1630 app, *Substantially Limited in Working*. Mr. Bullock identifies no such evidence. At most, the record shows difficulties with the shift requirements of this position, but it doesn't permit a reasonable jury to find Mr. Bullock was substantially limited in working a class or broad range of jobs. *See Frazier-Hill*, 75 F.4th at 803-06; *Carothers v. Cnty. of Cook*, 808 F.3d 1140, 1147 (7th Cir. 2015) ("demonstrating a substantial limitation in performing aspects of a single specific job is not sufficient to establish that a person is substantially limited in the major life activity of working.") (cleaned up). Indeed, the business proposed alternatives for him. Because no reasonable jury could find on this record that Mr. Bullock was substantially limited in a major life activity, no reasonable jury could find he qualified as disabled under the ADA.

10

CONCLUSION

Accordingly, the court GRANTS the summary judgment motion [26] and DIRECTS entry of judgment for Bimbo Bakeries Group USA, Inc. This order terminates the case.

SO ORDERED.

May 13, 2026                                         s/ Damon R. Leichty
                                            Judge, United States District Court